**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Special Agent Jennifer Lowman, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— Black Kyocera Cellular Phone described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I have been employed as a Special Agent with the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI), as of December of 2016. Prior to joining HSI, I was employed by the Forsyth County Sheriff's Office, in Winston-Salem, North Carolina, since July of 2007. I have participated in numerous investigations that have led to both misdemeanor and felony convictions in state and federal courts.

3. I attended and completed the Criminal Investigator Training Program and Homeland Security Investigations Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia with a graduation date of October 26, 2017. While at the academy, I was instructed in constitutional law, controlled substance law, federal criminal law, customs law, immigration law and civil statutes. I attended and completed the North Carolina Basic Law Enforcement Training program, as well as various advanced law enforcement training courses.

4. Through my training, which includes on-the-job discussions with other law enforcement agents, I have familiarized myself with the operational techniques and organizational structure of drug smugglers and drug trafficking distribution networks. My responsibilities include conducting investigations into drug smuggling organizations and individuals who derive substantial income from the illegal importation, manufacture, distribution, and sale of illegal controlled substances. As a Special

Agent with HSI, I am responsible for investigating and enforcing violations of federal law to include the enforcement of federal drug laws, and various Customs and Immigration violations.

5. Through my training and experience I know:

   a. That drug traffickers use cellular telephones to arrange, coordinate, and monitor criminal activities including communicating with smugglers, arrangers, and other transporters/drivers. They also use these devices to communicate with these same individuals during counter surveillance activities, to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans;

   b. That drug traffickers commonly maintain addresses or telephone numbers in books, papers, and cellular telephones which reflect names, usernames, addresses and/or telephone numbers of their associates in the smuggling organization;

   c. That drug traffickers/smugglers utilize cellular telephones to communicate about the logistics of smuggling narcotics to include providing status updates on clearing various Ports of Entry and Border Patrol checkpoints, providing instructions and information on destinations, transfers, and points of contact;

   d. That drug traffickers/smugglers will sometimes delete messages, call logs, and communication applications from mobile cellular devices to prevent authorities from accessing communications related to criminal activity;

   e. That drug traffickers//smugglers often use cell phones equipped with communication applications such as; WhatsApp, Facebook Messenger, and other applications. Some of these applications utilize encryption to thwart law enforcement efforts to identify the contents of the communications or identify the account user. Through my training and experience, I know that smugglers will delete the application from their phone to prevent law enforcement from discovering the content of their communications.

6.      This affidavit is based on information that is personally known by the Affiant or which the Affiant has learned from other law enforcement agents.  This affidavit is submitted for a limited purpose, intended only to show that probable cause exists for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched consists of one (1) cellular phone. The cellular phone is a Black Kyocera Cellular Phone with phone number 520-225-8116 and IMEI #015100000790627 seized as line item 0008 for seizure 2020260400046801, "**Device 1**." **Device 1** is currently secured at the Homeland Security Investigations Low Risk Evidence Vault, located at 41 Paseo de Yucatan, Rio Rico, Arizona.

8.      The requested warrant would authorize the forensic examination of **Device 1** for identifying electronically stored data described in Attachment B.

### PROBABLE CAUSE

9.      On May 4, 2020, at approximately 2:15 AM, Wenseslao MAZON-Espinoza, a United States Citizen, presented himself for inspection upon his re-entry into the United States from Mexico through the DeConcini Port of Entry in Nogales, Arizona.  MAZON was the driver, sole occupant, and registered owner of the 2015 Toyota Tacoma truck (hereinafter referred to as "truck") bearing Arizona registration CJM2185.  MAZON's truck had an attached trailer with an all-terrain vehicle and other items.  The trailer and ATV were registered to both MAZON and his wife, Diana Patricia Duarte De Espinoza.

10.     MAZON made initial contact with United States Customs and Border Protection (CBP) Officer Jared Dana during primary inspection.  MAZON stated he was traveling home to Tucson, Arizona and he was taking his ATV, tools, and tiles for a friend.  Officer Dana remembered MAZON from a previous encounter and remembered he had tiles during that encounter.  Officer Dana opened the

unlocked truck bed cover to examine the tile boxes. Officer Dana discovered whole tiles on top of each stack and beneath, the additional stacked tiles had been cut to place packages inside.

11.     Z-Portal operator CBP Officer Joseph Sokolowski observed anomalies in the truck's spare tire. CBP Canine Enforcement Officer Matthew Slusser and his Narcotics Detector Dog (NDD), Borys, (160729) conducted an inspection of the vehicle. NDD Borys alerted to a trained odor emitting from the spare tire mounted under the bed of the truck.

12.     Officer Dana removed 96 packages from the tile boxes and 72 packages from the spare tire. CBP Supervisor Alan Millot weighed multiple packages and tested their contents.

13.     CBPO Dana reported that one package tested positive for the chemical characteristics of fentanyl powder and weighed approximately 1 kilogram, another packaged tested positive for the chemical characteristics of fentanyl pills and weighed 591.5 grams, and a third package tested positive for the chemical characteristics of heroin and weighed 549.4 grams. The remaining 165 packages tested positive for the chemical characteristics of methamphetamine and weighed 78.10 kilograms.

14.     On May 6, 2020, CBP Supervisor Millot notified the Affiant that additional testing of the suspected heroin was conducted by the Nogales Forward Operating Laboratory. The substance was determined to be fentanyl.

15.     At the time of the incident at the port of entry, MAZON possessed a black Kyocera cellular telephone (Device 1) and a Samsung cellular telephone. CBP Officers seized both phones and turned them over to Homeland Security Investigations Special Agent Jennifer Lowman.

16.     A post-Miranda interview of MAZON was conducted at the port of entry.

17.     MAZON gave his consent to search both phones in writing and provided the password to Device 1 as "1968."

18.     During the post-Miranda interview of MAZON, he referred to Device 1 as his personal cell phone but stated both Device 1 and his other cell phone, the Samsung, were work phones and he did not own them.

19.     MAZON spoke to a male subject on Device 1 during the interview and said, "Some fucking bitch used me as a mule, oh, they call em burro, or mula, mule, I don't know what they call it. They asked me for a favor to bring tile to her cousin in Tucson.  And between the tile it was a bunch of drugs, bro."

20.     MAZON stated he made multiple deliveries of boxes of tiles from Mexico to the United States on behalf of his alleged intimate partner, Nancy Bracamontes.

21.     MAZON stated he experienced an issue with Device 1 and conducted a successful reset of Device 1 on Saturday, May 2, 2020, which deleted the older WhatsApp messages and likely deleted GPS information in Device 1.

22.     MAZON stated on the same night of the smuggling event, he visited Bracamontes at her rental home in Nogales, Sonora, Mexico then went to another house she had purchased.  During the interview, MAZON initially stated the tiles were loaded onto his truck by Nancy Bracamontes' brother and himself at her new house.  Later during the same interview, MAZON stated he left his truck at Bracamontes' rental house then drove together in Bracamontes' vehicle to her new home so MAZON could see a shower and she told MAZON about the tiles.

23.     MAZON left Bracamontes' home and drove directly to the port of entry, where he waited for an extended period of time to cross into the United States.

24.     The Affiant conducted a visual review of Device 1 with MAZON during the interview. The Affiant observed completed and missed calls on WhatsApp between MAZON and Bracamontes on May 3, 2020, just prior to the discovery of drugs at the port of entry at 7:40 PM, 7:43 PM, 8:04 PM, 8:05

PM. The Affiant observed missed WhatsApp calls to Device 1 from Bracamontes after MAZON had was discovered with drugs at the port of entry. The missed calls were at 3:04 AM and 3:10 AM.

25. The Affiant observed the WhatsApp message thread on Device 1 between MAZON and Bracamontes on May 3, 2020. MAZON told Bracamontes the line was very long, and she later asked how MAZON was doing. She continued to message MAZON to inquire about his status. She continued to send MAZON WhatsApp messages until 8:34 AM.

26. Based on the Affiant's training and experience, the Affiant knows it is common for co-conspirators transporting illicit narcotics to contact each other and check in by phone calls and/or messages to obtain updates on their status and location.

27. On May 5, 2020, Computer Forensic Analyst (CFA) Michael Collett completed an advanced logical extraction of Device 1, based upon MAZON's written consent.

28. Based upon information provided by CFA Collett, an advanced logical extraction is a hybridized logical and file extraction, which would not likely recover deleted data.

29. In May and June 2020, the Affiant reviewed the extraction report and found the WhatsApp message thread between MAZON on Device 1 and Nancy Bracamontes began on May 2, 2020. Other messages involving only MAZON on Device 1 and one additional person in the message thread began on May 2 or 3, 2020. Other messages were group message threads, involving multiple contacts, and ranged in dates between November 2015 and March 2020.

30. Data extracted from Device 1 (based on MAZON's written consent) showed the phone contained personal messages with his alleged intimate partners, including Nancy Bracamontes, multiple personal contacts, including his wife, children, and friends. Additional data such as videos and photos of himself were on Device 1. The user account on Device 1 displayed his name: Wense MAZON and included an image of MAZON. This information would indicate the phone was not only used for work-related business, but also used exclusively by MAZON as a personal phone.

31. On November 10, 2020, a federal grand jury indicted MAZON on one count of Conspiracy to possess with the intent to distribute Fentanyl and Methamphetamine, one count of Possession with intent to distribute Fentanyl, one count of Possession with intent to distribute methamphetamine, one count of Conspiracy to import Fentanyl and Methamphetamine, one count of Importation of Fentanyl, and one count of Importation of Methamphetamine in CR 20-2441-TUC-RCC (LAB).

32. On November 12, 2020, an arrest warrant for MAZON was issued and it was executed on November 20, 2020.

33. Based upon conversations with CFA Collett, and other agents, the Affiant knows the data produced in an extraction report may vary dependent upon the type of device data extraction completed and the particular extraction's capabilities to recover hidden files and deleted items. There may be additional data stored on Device 1 that may be material to the investigation, to include data not accessed by the method of the advanced logical extraction or data potentially deleted by the user, but not deleted from memory.

34. Based upon information provided by CFA Collett, the Affiant knows logical extractions can extract information such as short messaging service (SMS) text messages, contacts, call logs, media, and application data. File System extractions can extract SMS, contacts, call logs, media, application data, files, and hidden files. Physical extractions can extract SMS, contacts, call logs, media, application data, files, hidden files, and deleted data.

35. Therefore, the Affiant submits there is probable cause to believe Device 1 requested to be searched may contain evidence of drug trafficking activity and conspiracy of the same as it may reveal, among other things, telephone calls, text, and/or voice messages related to drug trafficking and the identity or location of the individuals who were involved in the procurement, transportation, and intended delivery of the controlled substances. Further, the Affiant requests specific permission to

conduct an extraction other than a logical examination in order to attempt to recover data hidden or deleted by MAZON on May 2, 2020 that may exist and would not have been recovered in the previous advanced logical download of Device 1.

36. Device 1 is currently in the lawful possession of Homeland Security Investigations. Device 1 is currently storage and secured in the HSI Nogales evidence vault, located at 41 Paseo de Yucatan, Rio Rico, Arizona.

## TECHNICAL TERMS

37. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and

    removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that

antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38. Based on my training, experience, and research, and from consulting the manufacturer's website and product information available online, I know that **Device 1** is a smartphone cellular telephone with capabilities that allow it to serve as a wireless telephone, receive and send messages, access the internet, utilize Wi-Fi, utilize GPS, and serve as a digital camera. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Examining data stored on this type, can also uncover, among other things, evidence that reveals or suggests who the user of the device was in communication with in 21 USC 846, Conspiracy to Possess with Intent to Distribute Fentanyl and Methamphetamine, and 21 USC 963, Conspiracy to Import Fentanyl and Methamphetamine.

39. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

40. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Device 1** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Device 1**:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

11

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Device 1** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **Device 1** to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

//

21-05965MB

## **CONCLUSION**

43. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Device 1** described in Attachment A to seek the items described in Attachment B. I believe that **Device 1** contains evidence relating to the commission of a criminal offense, that is, 21 USC 846, Conspiracy to Possess with Intent to Distribute Fentanyl and Methamphetamine, 21 USC 841(a)(1) and 841(b)(1)(A)(vi), Possession with Intent to Distribute Fentanyl, 21 USC 841(a)(1) and 841(b)(1)(A)(viii), Possession with Intent to Distribute Methamphetamine, 21 USC 963, Conspiracy to Import Fentanyl and Methamphetamine, 21 USC 952(a) and 960(a)(1) and 960(b)(1)(F), Importation of Fentanyl, 21 USC 952(a) and 960(a)(1) and 960(b)(1)(H), Importation of Methamphetamine.

Respectfully submitted,

JENNIFER E LOWMAN  Digitally signed by JENNIFER E LOWMAN
Date: 2021.09.20 09:25:52 -07'00'

Jennifer Lowman, Special Agent
Homeland Security Investigations

Electronically Subscribed and Sworn to Telephonically
on September 20, 2021:

_____
LYNNETTE C. KIMMINS
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

The place/item to be searched is:

A Black Kyocera cellular telephone seized as line item 0008 for seizure 2020260400046801 with phone number 520-225-8116 and IMEI #015100000790627, hereinafter referred to as "**Device 1**." **Device 1** is currently secured at the Homeland Security Investigations Low Risk Evidence Vault, located at 41 Paseo de Yucatan, Rio Rico, Arizona.

# ATTACHMENT B

1. All items on **Device 1** as described in Attachment A that relate to violation of 21 USC 846, Conspiracy to Possess with Intent to Distribute Fentanyl and Methamphetamine, 21 USC 841(a)(1) and 841(b)(1)(A)(vi), Possession with Intent to Distribute Fentanyl, 21 USC 841(a)(1) and 841(b)(1)(A)(viii), Possession with Intent to Distribute Methamphetamine, 21 USC 963, Conspiracy to Import Fentanyl and Methamphetamine, 21 USC952(a) and 960(a)(1) and 960(b)(1)(F), Importation of Fentanyl, 21 USC 952(a) and 960(a)(1) and 960(b)(1)(H), Importation of Methamphetamine.:

    a. Lists of contacts and related identifying information;

    b. Dates, places, times and information related to prior smuggling events, future smuggling events, or information about dates, places, and times related to the smuggling incident that occurred on May 4, 2020;

    c. Any information and/or communication related to stash houses, method of movement, drivers, or coordinators that facilitated the smuggling of the drugs into the U.S.;

    d. Any information related to the sources of drugs (including names, addresses, phone numbers, or any other identifying information) or the destination or individuals to whom the drugs were to be delivered (including names, addresses, phone numbers, or any other identifying information);

    e. Any information which would tend to indicate the physical location of the phone's user during the time period preceding the May 4, 2020, discovery of concealed narcotics at the port of entry.

    f.  Any information recording contact between Wenseslao MAZON-Espinoza and Nancy Bracamontes, and Wenseslao MAZON-Espinoza and any other co-conspirators whom have not yet been identified;

    g.  Evidence of user attribution showing who used or owned **Device 1** and at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    h.  Records evidencing the use of **Device 1** to access the Internet or other web based messaging or communications applications (ex. WhatsApp, GroupMe, Gmail, etcetera).

    i.  Images, movies, and other media containing evidence of smuggling activity including voice messages, images of drugs, smuggling, or the instrumentalities of drug smuggling such as vehicles, license plates, locations, documents/receipts for the purchase of smuggling instrumentalities, payment methods, and any other media associated with drug smuggling.

    j.  Location records/information.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.